**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALEJANDRO POZO VILLAR,<br>Plaintiff,<br>v.<br>FANNY VENECIA MARTINEZ,<br>Defendant. | CIVIL ACTION NO. 3:26-cv-02377<br>(SAPORITO, J.) |

**MEMORANDUM**

Presently before the Court is the verified complaint and petition filed by Alejandro Pozo Villar ("father") for the return of his children Aquilino Pozo Martinez ("A.P.M.") and Coral Pozo Martinez ("C.P.M.") to Spain from the respondent Fanny Venecia Martinez ("mother"). Doc. 1, 1-5. This petition was filed pursuant to the *Hague Convention on the Civil Aspects of International Child Abduction* ("Convention" or "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"). Oct. 25, 1980, 22514 U.N.T.S. 98 [hereinafter Hague Convention]; 22 U.S.C § 9001 *et seq*. The petitioner claims that the respondent wrongfully retained their children in the United States in breach of the Convention. This court has original jurisdiction over this matter under the authority of 22 U.S.C. § 9001(a).

## I. Procedural History

Petitioner filed his initial petition with the Central Authority for Spain in June 2026 and complaint in this Court on August 18, 2026, alleging a wrongful retention under the Convention and seeking to have C.P.M. and A.P.M. returned to Spain. Doc. 1. On September 8, 2026, petitioner withdrew his request for ex parte relief and requested a hearing on the merits of the verified complaint as soon as possible. Doc. 4. The respondent subsequently filed an answer on September 30, 2026. Doc. 8. A bench trial was then held on October 13 and 14, 2026. During the bench trial, the respondent narrowed down the affirmative defenses asserted by her to (1) father had consented to or subsequently acquiesced to the children's move and permission to remain in the United States and (2) the children object to being returned and have attained an age and degree of maturity at which it is appropriate to take account of the children's views. *See* Hague Convention art. 13. Subsequently, this Court issued an order granting the relief sought in the petitioner's complaint and petition. Doc. 12. The Court decided the issues based on the testimony of witnesses examined during the trial, the exhibits

admitted into the record, and the parties' arguments. The following opinion is in support of the Court's Order on October 14, 2026.

## II. FACTUAL FINDINGS

### A. Family Background

The petitioner-father and respondent-mother were married in 2011 in the Dominican Republic. Doc. 1, at 7. Father is a Spanish citizen who resides at Rua Francisca Lago 51, Ground Floor 36370, Nigran Pontevedra. *Id.* at 6-7. Mother is a citizen of the Dominican Republic and has a United States Resident Card. *Id.* at 7. She currently resides at 463 Youngwood Drive, East Stroudsburg, Monroe County, Pennsylvania 18301. *Id.* Father and mother have two children: C.P.M. born in 2012 and A.P.M. born in 2015. *Id.* Both children were born in the Dominican Republic, and both are dual citizens of Spain and the Dominican Republic. *Id.* In April 2019, mother sent three-year-old A.P.M to Spain to live with father followed by seven-year-old, C.P.M. in August 2019. *Id.* On July 15, 2020, mother then traveled to the United States from the Dominican Republic where she has resided since. *Id.* When the children resided in Spain between 2019 and 2025, mother visited them one time. On March 15, 2021, the parties were divorced by a judgment issued in

the Dominican Republic. *Id.* On December 6, 2021, mother remarried to a U.S. citizen.

### B. Custody Agreement in Spain

In 2024, family proceedings concerning custody and parental responsibility were conducted before a court in Spain. *Id.;* P-2. The Spanish court awarded parental authority jointly to both parents but gave full physical custody of the children to father. P-2 at 5. The agreement also states that when C.P.M. turns 15 and both children have been granted residency in the U.S., both parents will consider the possibility that the children may stay with their mother and study in the United States during the school year. *Id.* The agreement further establishes visitation rights for mother allowing the children to stay with her during the summer and some winter holidays. *Id.*

### C. A.P.M.'s and C.P.M.'s travel to the United States in June 2025

#### *i. Credibility Determinations*

On the issue of the children's travel to the United States, both mother and father testified during the bench trial. Specifically on this issue, based upon their demeanor and the consistency of their testimony

with the record as a whole, we found both parties to be less than fully credible.

### *ii. Nature of consent given for travel to the United States*

Both parties agree that A.P.M. and C.P.M. traveled to the United States in June 2025 to stay with mother. Prior to this date, the children resided and attended school continuously in Spain for approximately six years. P-10, P-11, P-12. The parties dispute the nature and duration of the consent given for the children to remain in the United States.

In the verified complaint, father alleged that he gave consent for the children to stay with their mother starting in June 2025 and attend school in the United States for the 2025-2026 school year. Doc. 1, at 4. This consent was conditioned on the children maintaining regular immigration and administrative status in the United States and returning to Spain in June 2026. *Id.* Father reiterated this position in a later memorandum of law submitted to the Court by his counsel. Doc. 9, at 15. During father's testimony, however, he told a different story. He testified that he only gave consent for the children to stay with their mother for summer 2025, returning to Spain in September 2025. On cross examination, he admitted that during September 2025, the children told

him that they would like to stay in the United States and complete the school year before returning to Spain. Furthermore, both children testified *in camera* and stated that their understanding of coming to the United States was to study for the 2025-2026 year.

Mother testified that she believed the children were allowed to stay until they achieved permanent resident status (which at the time of the hearing they still had not obtained). We found this recollection to be contradictory to various things on the record. First, the children originally came to the United States on the ESTA-Visa waiver program. P-25. This allowed the children to enter the United States for a maximum of 90 days. *Id.* Furthermore, both children had return tickets booked back to Spain on September 7, 2025. P-24 Finally, the custody judgment entered in Spain contemplates the possibility of the children residing with mother for an academic year in the United States if certain conditions are met (such as already obtaining a green card), but it does not mention them staying for a longer period in hopes of acquiring permanent residency. P-2 at 5.

Regardless of whether father gave explicit consent to his children's stay in the United States beyond September 2025, we find that at a

minimum he had eventually acquiesced to their stay in the United States for the entire 2025-2026 academic year.

### *iii. April 2026 Messages*

In April of 2026, father sent a message to mother on the platform WhatsApp asking what date in June the children will be returned so he could purchase the flight tickets. P-3. Mother responded saying that she will not return the children to Spain in June as they have not obtained permanent residency yet. *Id.* When father learned of this, he responded that the children's permanent residency in the United States is not his concern, and they must be returned on the agreed month. *Id.* Mother responded again saying that father will have to wait for the residency to be approved. Both parties agreed to the veracity of these messages when testifying. From these messages and testimony, we find that in April 2026, father ended his acquiescence and clearly communicated his revocation of consent for the children to remain in the United States, when mother informed him that she would not return the children at the end of the 2025-2026 school year.

### D. Testimony of C.P.M. and A.P.M.

#### *i. Credibility Determinations*

The Court conducted *in camera* examinations of C.P.M. and A.P.M. Based on their demeanor and the consistency of their testimony with the record as a whole, we find the testimony of both children to be credible.

#### *ii. Testimony of C.P.M.*

C.P.M. testified that she lived in Spain for approximately six years before coming to the United States in June 2025. The Court found her to be a bright young individual who was quite composed for her age. She had a clear preference of wanting to remain in the United States. She testified that she had made friends in the United States and enjoyed school in this country. Although she expressed a clear preference to remain, she never articulated a particularized objection to returning to Spain (other than to state she would prefer to stay in the United States). Her testimony that she felt sad in Spain seemed to stem simply from her preference to be in the United States. Additionally, she testified that while her father and paternal grandparents can be strict and at times disciplinarians, she loved her father and got along with him and her grandparents well.

#### *iii. Testimony of A.P.M.*

A.P.M. also testified that he resided in Spain before coming to the United States in June 2025. The Court found him to be articulate and composed for someone who is eleven years old. A.P.M. also expressed a desire to remain in the United States, citing his friendships and extracurricular activities like soccer. At the same time, he did not have any substantive objections to returning to Spain (other than to state he would prefer to remain in the United States). He testified that he loved his father, had many friends, and participated in extracurricular activities in Spain.

## III. CONCLUSIONS OF LAW

### A. The Hague Convention and ICARA

The Hague Convention is a comprehensive international treaty adopted by the United States in 1980. Oct. 25, 1980, 22514 U.N.T.S. 98. The Convention has two main goals: "(a) to secure the prompt return of children wrongfully removed or retained in any Contracting State; and (b) to ensure that rights of custody and access under the law of one Contracting State are effectively respected in the other Contracting States." *Id.* at art. 1. Congress enacted the International Child Abduction

Remedies Act ("ICARA") to implement the Convention. 22 U.S.C § 9001(b). The Convention and ICARA are not meant to solve international custody disputes but rather were established to "restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Tsai-Yi Yang v. Fu-Chiang Tsui,* 499 F.3d 259, 270 (3d Cir. 2007).

For a petition under the Convention to be successfully granted, the petitioner must show by a preponderance of the evidence that the removal or retention was wrongful. *Tsai-Yi Yang,* 499 F.3d at 270. To ascertain if the removal or retention was wrongful, a court should ask: "(1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention." *Id.* at 270-71. If a court finds that the petitioner has met his or her initial burden in showing that there was a wrongful removal or retention, it should promptly order the return of the child unless the respondent can show one of the exceptions of the Convention apply. Hague Convention

art. 12, 13. These defenses are to be construed narrowly to effectuate the purposes of the Convention. *Monzon v. De La Roca,* 910 F.3d 92, 97 (3d Cir. 2018). Furthermore, even when a court finds that the respondent has made a proper showing of a defense, it maintains discretion to order the child's return. *Id.*

**B. Petitioner has met his burden of presenting a prima facie case under the Convention.**

***i. Date of Wrongful Retention***

To establish the date of retention, a court must determine when a parent clearly communicated his or her desire to regain custody. *See Karkkainen v. Kovalchuk,* 445 F.3d 280, 290 (3d Cir. 2006). What constitutes a clear communication depends on the circumstances of the case, but it is not limited to the date the petition for child's return is filed. *Id.*

In this case, we find that April 2026 is the date of wrongful retention. Prior to this date, father acquiesced to the children's stay in the United States for the 2025-2026 school year. However, in April 2026, when mother sent a message saying she would not be returning the children in June 2026, father clearly and unequivocally revoked his consent for the children to remain in the United States. P-3.

### *ii. Habitual Residence*

To establish a child's habitual residence, a court must inquire into "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Tsai-Yi Yang v. Fu-Chiang Tsui,* 499 F.3d 259, 271 (3d Cir. 2007). Determining a child's habitual residence is a fact intensive exercise that depends on the circumstances of each case. *Id.* Under this inquiry, a court must focus on the child but should also consider the parents' shared intentions as to the child's location. *Id.* at 271-272. Considering the parents' shared intentions is important for two reasons: (1) a child's knowledge of these intentions can color their own ability to acclimatize and (2) to ensure "that neither parent is acting unilaterally to alter a joint understanding reached by the parents." *Karkkainen v. Kovalchuk,* 445 F.4d 280, 292 (3d Cir. 2006). Additionally, when considering the parents' intentions, a child's prior habitual residence must be effectively abandoned by the shared intent of the parents for him or her to acquire a new habitual residence. *Tsai-Yi Yang,* 499 F.3d at 272. Other factors courts have considered in the analysis are

things such as the child's current immigration status. *See Monasky v. Taglieri,* 589 U.S. 68, 78 n.3 (2020).

In this present case, the children's habitual residence was Spain before arriving in the United States in June 2025. They continuously resided and attended school there for six years. When they arrived in the United States, they resided and attended school for approximately ten months before the date of wrongful retention in April 2026.

Both C.P.M. and A.P.M. testified that they enjoyed school in the United States and had made friends. They further testified that they participated in extracurricular activities such as soccer and traveled within the United States to New York and New Jersey. Although this is evidence of acclimatization to the United States, the children testified that their understanding was that they came to the United States in June 2025 to attend school and stay with their mother. They never mentioned that they came to the United States to reside here permanently. Although C.P.M. testified that she believed that she would be able to stay for the 2026-2027 school year, this belief only came after a conversation with her father towards the end of the 2025-2026 school year. This means that before this conversation she had an understanding that she would only

be in the United States for the 2025-2026 school year. This understanding of their stay necessarily weighs against acclimatization. Furthermore, both children testified that they similarly had friends and participated in extracurricular activities in Spain. Additionally, both children currently do not have official legal status in the United States. They arrived under the ESTA program which authorized them to stay in the country for a maximum of 90 days. P-25. Although the children have green card applications pending, as discussed above, at the time of the hearing there was no approval. We find that this uncertainty in immigration status further weighs against acclimatization from the children's perspective.

With respect to the parents' shared intentions as to the habitual residence, the joint custody agreement entered in Spain establishes father as the sole custodian and Spain as the children's primary residence. P-2 at 5. Additionally, the April 2026 messages clearly establish no shared intention for the children to reside in the United States beyond the 2025-2026 school year and no shared intention to abandon Spain as the children's habitual residence. P-3. We therefore find that at the date of the wrongful retention, Spain was the children's habitual residence.

### *iii. Petitioner's custody rights at the time of retention*

The Convention defines custody rights "to include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Tsai-Yi Yang,* 499 F.3d at 275 (citing Hague Convention, art. 5(a)). Under this part of the analysis, a court must look at the laws of the child's habitual residence and determine if the petitioner's custody rights were breached at the time of retention. *Id.*

In the present case, the custody agreement in the children's habitual residence (Spain) clearly awards full physical custody to father. P-2 at 5. Although both parents have joint parental authority, the agreement gives father the responsibility of caring for the children and determining their residence. *Id.* We therefore find that the April 2026 retention of the children by mother breached father's custody rights under the law of Spain.

### *iv. Petitioner's exercise of custody rights at the time of retention*

To find that a petitioner was exercising his or her custody rights at the time of retention, very little is required. *Tsai-Yi Yang,* 499 F.3d at 277.

Absent a showing of clear abandonment, a court will not find that the petitioner failed to exercise his custodial rights. *Id.*

In the present case, both children testified that they conducted video calls with their father with frequency on WhatsApp. Furthermore, the custody agreement specifically contemplated allowing the children to come to the United States to spend time with mother for extended periods. We therefore find that at the time of the April 2026 retention, father had not abandoned his custodial rights and was exercising them.

**C. Respondent's Affirmative Defenses**

The Court now considers whether the respondent has satisfied her burden of establishing an affirmative defense under the Convention. At the close of the bench trial, upon inquiry from the Court, the respondent narrowed down her asserted affirmative defenses to the following: (1) father had consented to or subsequently acquiesced to the retention, and (2) the children object to being returned and have attained an age and degree of maturity at which it is appropriate to take account of their views. *See* Hague Convention art. 13. As discussed below, we find that neither defense applies in the present case.

#### *i. Respondent has not established that the petitioner consented to or subsequently acquiesced to the April 2026 Retention*

The Third Circuit has held that consent and acquiescence are distinct narrow elements and should be analyzed separately. *Baxter v. Baxter,* 423 F.3d 363, 371 (3d Cir. 2005). Acquiescence requires "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Id.* Consent does not require the level of formality that acquiescence does, and informal acts of permission can satisfy. *Id.* Importantly, both consent and acquiescence turn on the subjective intent of the parent who is said to have consented or acquiesced to the retention or removal. *Id.*

In the present case, the April 2026 messages establish that father did not have a subjective intent to allow the children to remain in the United States. Father did not consent to the children remaining in the United States beyond the 2025-2026 school year. The April 2026 messages clearly show that his understanding was that the children would be returned at the end of the school year. *See* P-3. Given that the respondent cannot meet her burden with respect to consent, she similarly

fails under the defense of acquiescence. The formal document that contemplated the children's travel to the United States is the custody agreement entered in Spain. There was no alteration to the custody agreement that would suggest that father acquiesced to the children staying in the United States beyond the school year.

### *ii. Respondent has not established that the wishes of the child exception applies*

When deciding if the court should apply the wishes of the child exception, there are various factors to consider. These include: (1) the level of maturity of the children, (2) if the children have a real particularized objection to being returned to their habitual residence, (3) if the objection is the result of undue influence, and (4) if applying the exception in the specific case would comport with the goals of the Convention. *See Tsai-Yi Yang,* 499 F.3d at 278-280. Additionally, when the children's wishes are the only reason that a court refuses to order the return of the children to their habitual residence, a court must apply a stricter standard when considering them. *Id.* at 278.

In the present case, as discussed above, the Court found both A.P.M. and C.P.M. to be bright, intelligent, and well-mannered children. The court was particularly impressed with their command of the English

language given the short time they have been in the United States. Additionally, there was no evidence from either children that their testimony was the result of coercion or undue influence. The Court asked and found the children's answers that their testimony was not influenced or coached in any way to be credible.

Both children expressed a clear preference to remain in the United States. They cited their love for school, friends they have made, and extracurricular activities they participate in. Although the children had a preference, neither child expressed a substantive particularized objection to returning to Spain. C.P.M. testified that her grandparents do not want her to be in Spain and cited some disciplinary examples, but we feel this amounts to nothing more than having strict grandparents. Additionally, both children testified that they loved father, that he treated them well most of the time, and that they enjoyed school and had friends in Spain. Given our mandate to construe the defenses in the Convention narrowly, we find that a general preference to remain in the United States without a particularized objection is not enough to meet the stricter standard we must apply when a child's wishes are the only reason underlying the repatriation decision.

Even if we were to find that the children's generalized preferences to remain in the United States were enough of a showing by the respondent, applying the defense in this case would be contrary to the purposes of the Convention. Article 1 of the Convention states that a goal of the Convention is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention art. 1. If we were to apply the defense in this case, we would be rewarding mother for violating the custody rights of father in Spain. Furthermore, part of the children's desire to remain in the United States comes from the months they have been wrongfully retained in the United States. Therefore, applying the exception in this case would encourage parents to retain or remove their children for as long as possible and hope they develop a strong preference to continue to stay where they are.

## IV. CONCLUSION

Consistent with the Court's Order on October 14, 2026, and for the reasons stated above, we will direct the clerk to enter judgment granting

the petitioner the relief requested in his verified complaint. An Order pursuant to Federal Rule of Civil Procedure 58 will follow.

Dated: October 27, 2026

***s/Joseph F. Saporito, Jr.***
JOSEPH F. SAPORITO, JR.
United States District Judge